**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JANE DOE,

          *Plaintiff*,

    v.

HOWARD UNIVERSITY,

          *Defendant*.

Civil Action No. 1:20-cv-01769 (CJN)

## MEMORANDUM OPINION

In January 2017, Plaintiff Jane Doe was raped by a Howard University lecturer at an off-campus apartment.  Claiming that Howard violated Title IX, was negligent, and breached its fiduciary duties to her, she filed this suit in June of 2020.  But by that time, the statute of limitations on each of her claims had already run.  The Court will thus grant Howard's Motion to Dismiss the First Amended Complaint ("Mot."), ECF No. 14.

### FACTS

On this Motion to Dismiss, the Court accepts all well-pleaded facts in the Plaintiff's Amended Complaint ("Compl."), ECF No. 13, as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).[1]

On January 7, 2017, a Howard University faculty member, Dr. Shawn Eastmond, raped Plaintiff Jane Doe.  Compl. ¶ 5.  Doe was in her final year of law school at Howard University

---

[1] Howard has moved in the alternative for summary judgment.  Because the Court resolves this matter based on the four-corners of the Amended Complaint, the Court will not assess that evidence.

School of Law.  *See id.* at ¶ 25.  At the time, she was residing in Vie Towers—then known as University Town Center Student Apartments—in Hyattsville, Maryland.  *Id.* at ¶ 26.

Doe lived in those apartments throughout law school.  *Id.*  The school pointed it out to her as a place where graduate students live.  *See id.* at ¶ 27.  Indeed, its resident population consisted almost entirely of undergraduate and graduate students at local universities and colleges, like Howard.  *Id.* at ¶ 28.  The Apartments even ran a free shuttle to and from the Howard campus.  *Id.* at ¶ 29.

In 2015, Doe met Eastmond for the first time, running into him in a common area of the building.  *Id.* at ¶ 31.  He later told her that he was a lecturer and professor at Howard, *id.* at ¶ 32, employed in the Department of Physics, *id.* at ¶ 33.  Since he also lived at the University Town Center Student Apartments, *see id.* at ¶ 35, the two would often pass each other in the halls and engage in conversation.  *Id.* at ¶ 34.

On January 6, 2017, Eastmond invited Doe to his apartment.  *Id.* at ¶ 35.  After Eastmond gave her fruit and water, Doe found that she could not move, and Eastman proceeded to rape her.  *Id.* at ¶¶ 36–37.

Doe escaped early the next morning, after Eastmond gave her a contraceptive pill and offered her money to stay quiet.  *Id.* at ¶ 38.  He called her later that morning, offering her more money to stay quiet and to have sex with him in the future.  *Id.* at ¶ 40.  Later that day, she called Howard University's Violence Prevention Hotline to report the assault.  *Id.* at ¶ 41.

Upon learning of the assault, the Director of Howard's Interpersonal Violence Prevention Program, Dr. Akosoa McFadgion, drove to Doe's apartment building to take her to the hospital.  *Id.*  The hospital performed a forensic exam.  *Id.* at ¶ 42.  After the examination concluded, McFadgion and the campus police helped move Doe to Slowe Hall, an undergraduate dormitory,

"in order to ensure [Doe's] wellbeing and safety." *Id.* The next day, Doe filed a police report with the Hyattsville Police Department and gave a formal statement to law-enforcement authorities. *Id.* at ¶ 44.

On January 9 or 10, Doe met with Candi Smiley, Howard's Title IX Coordinator. *Id.* ¶ 45. (The Title IX Coordinator is charged with overseeing the investigation and resolution of any reported misconduct and directing the provision of remedial and protective measures. *Id.* at ¶ 22.) Like all universities that accept federal funding, Howard had in place a Title IX policy. *See id.* at ¶ 15.[2] The Policy recognized that the University has a legal obligation to investigate all allegations of harassment and discrimination. *Id.* at ¶ 18. And it noted that filing a complaint was an activity that was protected from retaliation. *Id.* ¶ 19. Retaliation, the Policy noted, included "threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy." *Id.*

Howard's Policy also laid out how the university would respond to a complaint. *See id.* at ¶ 23. The Title IX Officer would commence an investigation and consult with the complaining individual to figure out if any remedial measures should be implemented during the investigation. *Id.* And, within sixty days of receiving the complaint, the Title IX Officer would "conduct an impartial, thorough and timely investigation of the complaint." *Id.* If more than sixty days would be needed, the Officer was required to let the complainant know in writing. Once the investigation was finished, it would be up to the Officer to prepare a Report of Investigation and to forward it to the Provost. *Id.* The Provost would then render a decision and, within ten days of that decision,

---

[2] Howard amended its Policy on January 18, 2017, but its terms did not materially change as relevant to this litigation. Compl. at ¶ 15.

the complaining party would be contacted to schedule a "Findings Meeting," where the individual would receive written notification of the results of the investigation. *Id.*

When Doe met with Smiley, Doe provided her with a full verbal report of the rape. *Id.* at ¶ 46. Doe also conveyed her desire to terminate her lease at the University Town Center Apartments and to find a new place to live. *Id.* Smiley informed Doe that an investigation would be performed and that the University would provide housing and academic accommodations. *Id.* at ¶ 47. Shortly after this meeting, Doe began counseling and mental-health-therapy sessions with Howard mental-health professionals. *Id.* at ¶ 48.

On January 27, Doe met with McFadgion and Dean Elaine Bourne-Heath, who was the Dean of Special Student Services. *Id.* at ¶ 49. Bourne-Heath's office was responsible for providing academic and housing accommodations to students. *Id.* Doe requested that her professors be notified of her disability so that her academic standing would not be affected. *Id.* at ¶ 51. Bourne-Heath promised her that she would do so. *See id.* Doe also requested to be moved from Slowe Hall, as it was an undergraduate dormitory and quite loud. *Id.* at ¶ 52. Bourne-Heath told her that "beggars can't be choosers." *Id.* But Doe was moved a few days later to a different residence hall. *Id.* at ¶ 57.

During this meeting, Bourne-Heath also allegedly demanded that Doe describe in detail the nature and circumstances of her rape in order to receive the requested accommodations. *Id.* at ¶ 53. Doe cried as she described what had happened; Bourne-Heath repeatedly told her to "suck it up," "get over it," "move on," and to "stop crying" about having been raped. *Id.* Eventually, Bourne- Heath ordered Doe to leave her office. *Id.*

Doe reported Bourne-Heath's behavior to Smiley a few days later, but Bourne-Heath's conduct during this meeting was never investigated. *Id.* at ¶ 54.

4

On January 30, Doe again requested that she be relieved from her lease at the University Town Center Student Apartments. *Id.* at ¶ 56. Smiley wrote a note to the building that Doe had a "conflict with another Howard University student who resides in UTC housing." *Id.* She did not identify Eastmond by name, nor note that he was a faculty member who had been accused of raping Doe. *Id.* Thereafter, Doe did not hear anything from Howard for several weeks. *Id.* at ¶ 58. "During this time period, [Doe] received no information indicating that Eastmond was prohibited from campus, terminated, or that measures were in place to ensure [that Doe] would not encounter him or be subjected to future danger." *Id.*

On March 29, 2017, Doe learned that Howard had failed to notify her professors about the assault and her resulting absences. *Id.* at ¶ 59. Doe promptly inquired of McFadgion why this was the case, *see id.*, and on April 4 learned from Adrienne Packard, Director of Student Affairs at the Law School, "that despite receiving the request for academic accommodations, she 'didn't see a specific needed [sic] to share with the faculty'—a decision that 'may not have been accurate,' " *id.* at ¶ 60. On April 21, Packard informed Doe that her professors had finally been informed of her disability and the need for academic accommodations. *Id.* at ¶ 61.

A few days later, on April 25, Smiley informed Doe for the first time that "Professor Eastmond is not allowed on campus." *Id.* at ¶ 62. Doe alleges that she did not know about Eastmond's banishment before this date. *Id.* That same day, Doe reiterated to Smiley what Bourne-Heath had said to her during their January meeting. *Id.* at ¶ 63. Howard did not, however, investigate Bourne-Heath's conduct. *Id.*

While she was studying for finals, Doe learned that she had a balance due on her account to cover the cost of her new housing accommodations. *Id.* at ¶ 64. This was contrary to representations that Bourne-Heath and McFadgion had made regarding Howard waiving any

5

housing costs as part of her Title IX accommodations. *Id.* On May 8, another dean of the Law School informed Doe that those costs would be removed from her account. *Id.* ¶ 66.

Doe graduated from the Law School on May 13, 2017. *Id.* On June 30, 2017, Smiley sent Doe a one-page "Notice of Findings" letter. *Id.* at ¶ 67. It informed her that "the evidence presented is sufficient to sustain a finding of sexual violence in violation of the Title IX policy. Based on a thorough review of the record, there is sufficient evidence to determine that Dr. Eastmond committed acts [of] sexual violence against you." *Id.* The letter continued: "Dr. Eastmond shall be removed from his lecturer position indefinitely, effective immediately. Dr. Eastmond shall be barred from the campus and anywhere the University conducts business for one year. Dr. Eastmond may not return to campus on, and not before, April 28, 2018. Dr. Eastmond shall be barred from employment at Howard University, effective immediately and indefinitely." *Id.* at ¶ 68. The letter was signed by Dr. Anthony Wutoh, Howard's Provost. *Id.* at ¶ 69. And the letter indicated that the Title IX Investigator for the matter had been Marcus A. Winder. *Id.* at ¶ 70. Doe had never spoken to Winder, nor was she aware he was investigating her complaint, before she received this letter. *Id.*

Doe filed this suit on June 29, 2020. *See generally id.* She asserts four counts, claiming discrimination in violation of Title IX, *id.* at ¶¶ 79–87; retaliation in violation of Title IX, *id.* at ¶¶ 88–99; negligence, *id.* at ¶¶ 100–13; and breach of fiduciary duty, *id.* at ¶¶ 114–20. Howard filed a Motion to Dismiss or, in the alternative, for Summary Judgment. *See generally* Mot.

## LEGAL BACKGROUND

A Rule 12(b)(6) motion to dismiss argues that the Complaint fails to state a claim. Fed. R. Civ. P. 12(b)(6). When assessing this type of motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from

the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). "[A] formulaic recitation of the elements of a cause of action," however, "will not do"; a complaint must provide more than mere labels and conclusions. *Bell Atl.*, 550 U.S. at 555. Put differently, a claim to relief must be "plausible on its face," and the pleadings must "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

A court can grant a motion to dismiss when the allegations demonstrate that the applicable statute of limitations has already run. *Lloyd v. Ingenuity Prep Pub. Charter Sch.*, 368 F. Supp. 3d 25, 26–27 (D.D.C. 2019) (quoting *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998)). "Because statute of limitations issues often depend on contested questions of fact, however, the court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Williams-Jones v. LaHood*, 656 F. Supp. 2d 63, 67 (D.D.C. 2009) (citing *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)). But if the complaint conclusively shows that the applicable time period has run, and that the plaintiff has no viable response to the defense, the Court must grant the motion. *See Doe v. Kipp DC Supporting Corp.*, 373 F. Supp. 3d 1, 7 (D.D.C. 2019).

## I. APPLICABLE STATUTES OF LIMITATIONS

### A. Doe's Title IX claims are subject to a one-year statute of limitations

Title IX of the Education Amendments of 1972 mandates that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Universities that accept federal funding must comply with Title IX. *See Cavalier v. Catholic Univ. of America*, 306 F. Supp. 3d 9, 25 (D.D.C. 2018). The statute does not

expressly grant a private right of action, and thus it was originally left to federal agencies to enforce the statute. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280–81 (1998). But in the late 1970s, the Supreme Court implied a private right of action to enforce the statute. *Id.* at 281 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)).

Because Title IX does not have an express private cause of action, it unsurprisingly also does not have a statute of limitations. In such situations, the Supreme Court has recognized, courts must analogize to state law: "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266–67 (1985). To accomplish this, a court's "task is to 'borrow' the most suitable statute or other rule of timeliness from . . . the most closely analogous statute of limitations under state law." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983).

Problems with this practice, *see Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377–80 (2004), led Congress to pass 28 U.S.C. § 1658, which creates a general statute of limitations of four years, so long as no law is to the contrary. 28 U.S.C. § 1658(a). But "§ 1658 applies only to claims arising under statutes enacted after December 1, 1990." *Jones*, 541 U.S. at 380. Title IX of the Education Amendments of 1972, of course, was enacted before December 1, 1990. The Court thus sees no option but to apply the test laid out by the Supreme Court in *Wilson*.

The parties cite to several cases from this district that have applied a three-year statute of limitations to Title IX claims. *See* Pl.'s Resp., ECF No. 16, at 38 (citing *Richards v. Duke Univ.*, 408 F. Supp. 2d 222, 238 (D.D.C. 2007)); Mot. at 39 (citing *Cavalier*, 306 F. Supp. 3d at [42];

*Richards*, 408 F. Supp. 2d at 238; & *Doe*, 373 F. Supp. 3d at 8).[3]  But they cite no controlling case from either the Supreme Court or the Court of Appeals on this matter, and the Court is aware of none.

This Court must therefore decide which D.C. statute of limitations is most analogous to the implied private right of action under Title IX.  Several other courts of appeals have addressed this or similar questions.

The Ninth Circuit, for example, has held that California's personal-injury statutes of limitations are the proper analogs for Title IX claims brought there.  *Stanley v. Trustees of Calif. State Univ.*, 433 F.3d 1129, 1135 (9th Cir. 2006).  In the Ninth's Circuit's view, "[b]ecause Title IX and Title VI use the same language, they should, as a matter of statutory interpretation, be read to require the same levels of protection and equality." *Jeldness v. Pearce*, 30 F.3d 1220, 1227 (9th Cir. 1994).  And the Ninth Circuit had already "decid[ed] that personal injury statutes of limitations applied to Title VI," by "approvingly cit[ing] a Third Circuit case, *Bougher*, pointing out that it had applied state personal injury statutes of limitations to Title IX."  *Stanley*, 433 F.3d at 1135 (citing *Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993)).

The Second Circuit has reached a similar conclusion.  Noting its general practice "of borrowing the state statute of limitations for personal injury actions for analogous federal discrimination actions brought pursuant to 42 U.S.C. §§ 1981 and 1983," the court adopted New York's personal-injury statute of limitations for Title IX claims brought there.  *Curto v.*

---

[3] Following its initial briefing—which primarily argued that the relevant statute of limitations was three years but Doe's claims were still untimely—Howard has also argued that a one-year statute of limitations applies, Def.'s Reply Br., ECF No. 17, at 21 n.2.  Doe acknowledges that this position is properly before the Court.  *See generally* Pl.'s Mot. to Strike Supp. Mem., ECF No. 22-1; *see also id.* at 1 ("Defendant's filing impermissibly re-argues a point already made during the initial briefing period on Defendant's motion to dismiss.").

*Edmundson*, 392 F.3d 502, 504 (2d Cir. 2004).  In doing so, the Second Circuit noted that "our sister circuits that have confronted the issue have concluded that Title IX claims are most closely analogous to personal injury actions and, therefore, have borrowed the state statute of limitations for personal injury action."  *Id.* (citing *M.H.D. v. Westminster Sch.*, 172 F.3d 797, 803 (11th Cir. 1999); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 728–29 (6th Cir. 1996); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 (8th Cir. 1995); *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 77–78 (3d Cir. 1989)).  Other circuits have more recently followed suit.  *See King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759 (5th Cir. 2015); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1213 (10th Cir. 2014).

Very few of these court of appeals decisions, however, actually grapple with which analogous state law (and its right of action) is most similar to Title IX (and its implied right of action).  *See DelCostello*, 462 U.S. at 158.  Instead, their analysis is typically cursory and dependent on citations to other cases that have reached the same conclusions.  *See, e.g.*, *Varnell*, 756 F.3d at 1213 ("We agree with the magistrate judge that we should apply the same state statutes that apply to § 1983 claims.  That appears to be the uniform rule of the other circuits."); *King-White*, 803 F.3d at 759 ("We now join our sister circuits and hold that Title IX should be treated like § 1983 for limitations purposes.  We find that the Eighth Circuit's opinion in *Egerdahl* . . . particularly persuasive on this point."); *M.H.D.*, 172 F.3d at 803 ("Courts generally agree that a Title IX claim for damages is most closely analogous to a common law action for personal injury; therefore, the statute of limitations for personal injury actions controls."); *Lillard*, 76 F.3d at 729 ("Therefore, because we believe that the cases applying state personal injury limitations periods to Title IX and Title VI claims, and *Bougher* in particular, are well-considered and correctly decided, we adopt that reasoning today.").  Many also rely on prior holdings in the Title VI context.

*See, e.g.*, *Egerdahl*, 72 F.3d at 618 ("Title IX should be subject to the same limitations period that applies to § 1983 and Title VI.").

The Court of Appeals here, however, has never addressed what statute of limitations applies in the Title VI context. Indeed, there is a split of authority among judges on the district court as to what statute of limitations applies to such claims. *See Stafford v. George Washington Univ.*, No. 18-cv-2789 (CRC), 2022 WL 35627, at *8–9 (detailing the split in authority).

The Court must therefore determine what type of action under D.C. law a Title IX claim is most analogous too. In cases subsequent to *Cannon*, the Supreme Court "ha[s] defined the contours of [the] right of action" identified in *Cannon*. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). As the Supreme Court has put it, "the private right of action encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to a teacher's sexual harassment of a student." *Id.* (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91 (1998)). The private right of action also covers "sexual harassment of a student by another student." *Id.* (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999)). And it covers "[r]etaliation against a person because that person has complained of sex discrimination." *Id.*

These types of claim do not seem most analogous to personal-injury claims under D.C. law. *See DelCostello*, 462 U.S. at 158. Title IX claims are filed against schools. Schools typically do not commit acts of sexual harassment that cause personal injury to a student, nor are they typically liable under Title IX for the misconduct of their teachers. *Davis*, 526 U.S. at 642 ("Accordingly, we rejected the use of agency principles to impute liability to the district for the misconduct of its teachers." (citing *Gebser*, 524 U.S. at 283)). To be sure, student-on-student (or teacher-on-student) harassment can form the basis of a Title IX claim, *see Davis*, 526 U.S. at 642;

11

*Gebser*, 524 U.S. at 283, but only when the school is "deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge." *Davis*, 526 U.S. at 642. Such a Title IX claim is not based on the harassment alone, *id.,* but depends on the school's deliberate indifference—something different from a personal-injury claim. This case is a good example: Doe alleges that Howard violated Title IX through its deliberate indifference to her assault. *See* Compl. ¶ 84 ("[T]he university acted with deliberate indifference to Plaintiff's complaint.").

The Court therefore concludes that Title IX claims are more analogous to claims under the D.C. Human Rights Act, D.C. Code § 2-1402.01 *et seq.* The DCHRA grants "[e]very individual" the "equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to, . . . educational institutions." *Id.* § 2-1402.01. It further expressly prohibits "educational institutions" from "deny[ing], restrict[ing], or [ ] abridg[ing] or condition[ing] the use of, or access to, any of its facilities, services, programs, or benefits from any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived . . . sex, . . . sexual orientation, gender identity or expression, familial status, [or] family responsibilities." *Id.* § 2-1402.41(1). And it has a private right of action to enforce its terms. *Id.* § 2-1403.16. The DCHRA thus allows individuals in the District to vindicate intentional acts of sex discrimination. *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994) (retaliation); *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 (D.C. 1993) (sex discrimination); *compare* 20 US.C. § 1681 ("No person in the United States shall, *on the basis of sex*, . . . be *subjected to discrimination* under any education program or activity receiving Federal financial assistance." (emphasis added)).

This conclusion is supported by the D.C. Court of Appeals decision in *Jaiyeola v. District of Columbia*, 40 A.3d 356 (D.C. 2012).   There, the court had to determine what statute of limitations applied to § 504 of the Federal Rehabilitation Act, which "provides that '[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Id.* at 362 (quoting 29 U.S.C. § 794(a)) (alterations in original).   The court noted that, given the lack of a federal statute of limitations, it had "to identify the District law most closely analogous to § 504 and borrow its limitations period, unless doing so would stymie the policies underlying the federal cause of action."   *Id.* at 364 (quotations omitted).

The *Jaiyeola* court declined to adopt the statute of limitations for personal-injury claims, opting to apply that of the DCHRA instead.   *See id.* 365–69.   As it explained, "Unlike § 1983, which is a uniquely federal remedy that can have no close counterpart in state statutes, § 504 of the Rehabilitation Act can, and does, have counterparts in some states.   A state anti-discrimination statute that furnishes a sufficiently broad cause of action for disability discrimination may be the most closely analogous state statute to § 504."   *Id.* at 365 (quotations omitted) (alterations accepted).   In such a case, the court explained, "the specific cause of action for disability discrimination would be a better fit than the more general personal injury cause of action."   *Id.*

The court went on to explain that, while there are many difference between § 504 and the DCHRA—§ 504 is narrow in scope, while the DCHRA covers many types of discrimination, for example—"these differences pale in comparison to the similarities."   *Id.* at 366.   The court noted that the DCHRA aims to end discrimination in the District for any reason other than that of individual merit; that it creates a private cause of action for the victims of such discrimination; and that it provides for compensatory damages and equitable relief "no less broad than the range of

remedies available under § 504 of the Rehabilitation Act." *Id.* at 367.  It then went on to reject any comparison to D.C.'s personal-injury laws:  "Personal injury claims need not—and, indeed, typically do not—seek to remedy discrimination at all, and the three-year statute of limitations for such claims certainly was not chosen with discrimination claims in mind." *Id.*  Rather, it found that the DCHRA's statute of limitation was specifically created to deal with claims of discrimination:  "In contract, the [DC]HRA . . . has a statute of limitations intended specifically for claims of discrimination.  It is no objection that the [DC]HRA has broader coverage of discrimination than § 504 has." *Id.* at 367–68.  The court thus concluded that "a Rehabilitation Act claim is far more similar to a[ ] [DC]HRA claim than it is to an ordinary personal injury claim, and the [DC]HRA must be deemed the District statute most analogous to § 504." *Id.* at 368.

Each of those factors applies with equal force in the Title IX context.  As the D.C. Court of Appeals explained, the DCHRA's statute of limitations was "intended specifically for claims of discrimination." *Id.*  Its remedies apply broadly. *Id.* at 367.  And under District law, "Personal injury claims . . . typically do not . . . seek to remedy discrimination at all," to such a degree that "the three-year statute of limitations for such claims [under D.C. law] certainly was not chosen with discrimination in mind." *Id.*[4]

This Court's "task is to 'borrow' the most suitable statute or other rule of timeliness from . . . the most closely analogous statute of limitations under state law," *DelCostello*, 462 U.S. at 158.  For the reasons discussed above, the DCHRA is the most closely analogous statute of limitations for Doe's Title IX claims.  Doe accordingly had one year from the time her claims

---

[4] Another court in this District has recently concluded, in light of *Jaiyeola*, that the DCHRA's statute of limitations applies to claims made under Title VI. *See Stafford*, 2022 WL 35627, at *9–10.  The Court finds the reasoning of that opinion to apply as well in the Title IX context.

accrued to assert those claims. *See* D.C. Code § 2-1403.16(a) ("A private cause of action pursuant to this chapter shall be filed in a court of competent jurisdiction within one year of the *unlawful discriminatory act*" (emphasis added)).[5]

### B. Doe's negligence and breach-of-fiduciary-duty claims have a three-year statute of limitations

Negligence claims, under D.C. law, have a three-year statute of limitation. *Stewart-Veal v. District of Columbia*, 896 A.2d 232, 236 (D.C. 2006) ("[A] negligence claim . . . is governed by a three-year statute of limitations."). And a breach-of-fiduciary-duty claim does too. D.C. Code §§ 12-301(7), (8); *see also Hillbroom v. PricewaterhouseCoopers LLP*, 17 A.3d 566, 571 n.7 (D.C. 2011).

### C. The extended statute of limitation from D.C. Code § 12-301(11) does not apply

Doe contends that the lengthened statute of limitations from D.C. Code § 12-301(11) applies to her claims. Pl.'s Resp. at 41–43. That section states that "for the recovery of damages arising out of sexual abuse that occurred while the victim was less than 35 years of age [the statute of limitations is] the date the victim attains the age of 40 years, or 5 years from when the victim knew, or reasonably should have known, of any act constituting sexual abuse, whichever is later." D.C. Code § 12-301(11). This provision is inapplicable here.

---

[5] The Court does not believe that other decisions in this district compel a different result. *Richards*, for example, merely states that "[i]n the District of Columbia, a personal injury action has a three-year statute of limitations and therefore, a Title VI or Title IX claim also has a three-year statute of limitations in the District of Columbia," *Richards*, 480 F. Supp. 2d at 238; the opinion does not analyze why a Title IX claim is most like a personal injury one. *See id.* And *Cavalier* did not have to engage in any analysis at all; there (unlike here), the "parties agree[d] that both Cavalier's Title IX and remaining tort claims are subject to a three-year statute of limitations." *Cavalier*, 306 F. Supp. 3d at 42. And in *Doe*, the court did not need to resolve the question "because either way, Doe's Title IX and § 1983 constitutional claims are time-barred." *Doe*, 373 F. Supp. 3d at 11.

First, Doe's claims are not targeted at an act of sexual abuse.  Rather, they charge Howard with failing to respond to her complaints in the correct manner.  To be sure, the reason she rendered the complaints was because she survived a horrific rape.  But that does not mean her claims "arise[ ] out of" that terrible incident.  To "arise," in its legal sense, is "[t]o originate; to stem (from)," as in "a federal claim arising under the U.S. Constitution." *Arise*, *Black's Law Dictionary* (11th ed. 2019).  The origination of Doe's claim is not her rape, but the alleged failures of Howard in responding to her complaint; indeed, that is the specific harm a Title IX claim rectifies.  And, in any event, "arising from sexual abuse," as used in § 12-301(11), modifies "recovery of damages." The text thus creates some remedial relationship between the damages claimed and "sexual abuse." But again, that is not the crux of Doe's claim:  the damages she seeks do not remedy sexual abuse at all, but rather Howard's allegedly wrongful conduct under Title IX.

Second, as to her Title IX claims, the Court must decide which D.C. statute of limitations is the most analogous for *all* claims under Title IX.  *Cf. Wilson*, 471 U.S. at 275.  Given the sex-discrimination focus of Title IX, the statute of limitations of D.C.'s own sexual-harassment statute—the DCHRA—should apply.  Title IX is a broad statute; it encompasses much more than just sexual abuse.  Doe has pointed to no case suggesting that there should be different statutes of limitations for different kinds of Title IX claims.

*     *     *

The Court thus concludes that a one-year statute of limitations governs Doe's Title IX claims and that a three-year statute of limitations governs her D.C. common-law claims.

## II. DOE'S SUIT IS UNTIMELY

Statutes of limitations in the District begin to run "from the time the right to maintain the action accrues."  D.C. Code § 12-301  As the D.C. Court of Appeals has explained, "A cause of

action generally accrues, and triggers the commencement of the applicable statute of limitations period, at the time the injury occurs." *Radbod v. Moghim*, ___ A.3d ___, 2022 WL. 480733, at *6 (D.C. 2022). But when the relationship between the fact of the injury and the tortious conduct is obscure at the time of the injury, "a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Knight v. Furlow*, 553 A.2d 1232, 1234 (D.C. 1989).

### A.  Count I: Discrimination under Title IX

In her Amended Complaint, Doe alleges a number of acts by Howard that violated Title IX. Compl. ¶ 84. But each occurred in 2017, and Doe filed her initial complaint well outside the one-year statute of limitations. Count I is therefore time-barred.[6]

---

[6] The Court would reach the same result even if the relevant statute of limitations was three years, not one. The key events underlying Doe's Title IX claim—the rape, the actions by Howard's administrators, the delay in learning that Eastmond had been barred from campus, the failure to waive payment for the dorm room, and even Doe's graduation—occurred well over three years before this case started. *See* Compl. ¶ 84. The only alleged event that occurred within three years of this suit was Doe's receipt of Howard's decision on her complaint—a decision that upheld Doe's complaint. *See id.* And even then, Doe had notice of the investigation's alleged untimeliness once sixty days had passed from her initial complaint; she did not need to wait until she reviewed the findings to raise this claim.

### B. Count II: Retaliation under Title IX

Count II has an identical flaw. Doe alleges several acts of retaliation that violated Title IX, but all occurred in the first half of 2017. *See* Compl. ¶¶ 88–99. Since she filed this suit in 2020, however, this claim is also time barred.[7]

### C. Count III: Negligence

As discussed, a negligence claim has a three-year statute of limitations in D.C. But Doe knew of, or reasonably should have known of, each of the alleged negligent actions more than three years before filing suit. She alleges that Howard knew Eastmond was dangerous, yet hired him anyway. *Id.* ¶¶ 106, 108. But this claim accrued more than three years before she filed this suit. She alleges that Howard breached a duty of reasonable care by letting Eastmond reside in the same off-campus apartment building as her, and failed to exercise reasonable care in supervising him there. *Id.* ¶¶ 107, 109. But this claim also accrued more than three years before this suit. She claims that Howard failed to exercise reasonable care by not promulgating or enforcing rules prohibiting sexual acts by a faculty member to a student, and by not stopping Eastmond in particular. *Id.* ¶¶ 110–11. But she knew (or should have discovered) this shortly after her attack, as well. Indeed, Doe alleges that the "direct and proximate result of the aforementioned breaches" was the terrible rape and assault she suffered "on January 7, 2017." *Id.* ¶ 112. This, however, was more than three years before she filed this action on June 29, 2020.

### D. Count IV: Breach of Fiduciary Duty

Doe alleges that, "[a]s a direct and proximate result of Howard University's aforementioned breach of fiduciary duty to Plaintiff, Plaintiff was raped and assaulted by

---

[7] The Court would reach the same decision if the relevant statute of limitations was three years, not one, for the reasons mentioned in note 6, *supra*.

Eastmond, a Howard University faculty member and lecturer/professor, on January 7, 2017."
Compl. ¶ 119.  Because that event and injury occurred more than three years before Doe's June
29, 2020 complaint, Count IV is also untimely.

*      *      *

Doe survived a terrible ordeal at the hands of a Howard University professor.  But she filed
her claims against the school after the statutes of limitations had run.  The Court thus grants
Howard's Motion to Dismiss the First Amended Complaint, ECF No. 14.

DATE:  March 28, 2022

CARL J. NICHOLS
United States District Judge